LIA COMERFORD (OSB No. 141513)
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR  97219
T: (503) 768-6823
F: (503) 768-6642
comerfordl@lclark.edu

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **NORTHWEST ENVIRONMENTAL ADVOCATES**, an Oregon nonprofit corporation, | Case No. 3:15-cv-01151 |
| Plaintiff, | COMPLAINT |
| v. | Administrative Procedure Act (5 U.S.C. § 702) |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY** and **GINA McCARTHY**, in her official capacity as Administrator of the United States Environmental Protection Agency, | |
| Defendants. | |

## INTRODUCTION

1.    Plaintiff Northwest Environmental Advocates ("NWEA") brings this action pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702 *et seq*., challenging the United States Environmental Protection Agency's ("EPA") and the EPA Administrator's approval of Idaho's water quality criteria for arsenic, established by that State and submitted for EPA review under section 303 of the Clean Water Act ("CWA"), 33 U.S.C. § 1313.

2.    Arsenic is a highly toxic pollutant that can harm people at low concentrations. Studies have shown that exposure to or consumption of arsenic, in its inorganic form, can impair or damage almost every human function, including the nervous, cardiovascular, renal, and respiratory systems, and arsenic is a known human carcinogen, causing lung, urinary bladder, skin, and possibly liver, kidney, and prostate cancers. Arsenic is found throughout the surface and ground waters of the State of Idaho, often as a result of human land-disturbing activities such as metallic mining and ore processing, and people are exposed to this arsenic through the consumption of water and fish.

3.    The CWA requires states to adopt, and EPA to review and approve or disapprove, water quality standards that, *inter alia*, "protect the public health and welfare [and] enhance the quality of water" in each state. 33 U.S.C. § 1313(c)(2)(A). EPA regulations explicitly require states to follow EPA guidance or "[o]ther *scientifically defensible* methods" when adopting numeric water quality criteria.[1] 40 C.F.R. § 131.11(b) (emphasis added). These directives

---

[1] Water quality "criteria" are but one part of water quality "standards" under the CWA; criteria are defined by EPA as "elements of State water quality standards, expressed as constituent concentrations, levels, or narrative statements, representing a quality of water that supports a particular use." 40 C.F.R. § 131.3; *see also Nw. Envtl. Advocates v. U.S. E.P.A.*, 855 F. Supp. 2d 1199, 1208-09 (D. Or. 2012). While the CWA requires EPA approval of state water

notwithstanding, in 2010 EPA impermissibly approved Idaho's adoption of numeric water quality criteria for arsenic that were developed under a wholly separate regulatory regime—the federal Safe Drinking Water Act ("SDWA")—without considering the relevant factors under the CWA, without employing a "scientifically defensible" methodology, and without determining whether Idaho's new arsenic criteria would actually protect human health, a designated use.

4.     Moreover, EPA's approval contradicts its own established policy against allowing states to use SDWA standards when they establish human health criteria pursuant to the CWA. EPA has long recognized that standards developed for SDWA purposes do not account for fish consumption or other pathways of human exposure, and take economic and other factors into account that are not permissible when setting water quality standards under the CWA. *See, e.g.*, Memorandum from Martha G. Prothro, Director, EPA Office of Water Regulations and Standards, to Water Management Division Directors, EPA Regions I-IX (Nov. 3, 1999); 65 Fed. Reg. 66,444, 66,451 (Nov. 3, 2000).

5.     Notably, EPA's national recommended water quality criteria for arsenic for the protection of human health are 0.14 µg/L (for consumption of fish only) and 0.018 µg/L (for consumption of both fish and water). However, Idaho adopted, and EPA approved, arsenic human health criteria of 10 µg/L (for both consumption of fish only and for consumption of both fish and water)—a level several orders of magnitude greater than EPA's recommended criteria, but equal to the arsenic Maximum Contaminant Level ("MCL") established by EPA under the SDWA.

---

quality standards in their entirety, including but not limited to numeric and narrative criteria, in this action NWEA challenges only EPA's approval of Idaho's numeric human health criteria for arsenic.

6.      Because Idaho's human health criteria for arsenic fail to satisfy the relevant statutory and regulatory requirements under the CWA, EPA's approval of those criteria was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

7.      EPA's arbitrary and capricious action has harmed and continues to harm NWEA's interest, and the interests of its members, in having clean and unpolluted waters in Idaho that are fit for human use, including fish consumption, and as habitat for aquatic and aquatic-dependent species. NWEA seeks declaratory, injunctive, and other appropriate relief on its own behalf and on behalf of these members.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to the APA, 5 U.S.C. §§ 701–704, and the federal question statute, 28 U.S.C. § 1331.

9.      Venue in this district and division is proper pursuant to 28 U.S.C. § 1391(e)(1)(C) and Local Rule 3-2 because no real property is involved in this action and plaintiff NWEA resides in this district and division.

10.      The relief requested herein is authorized by the APA, 5 U.S.C. § 706(2); the Equal Access to Justice Act, 28 U.S.C. § 2412; and 28 U.S.C. §§ 2201-02.

## PARTIES

11.      Plaintiff NORTHWEST ENVIRONMENTAL ADVOCATES is a regional non-profit environmental organization incorporated under the laws of Oregon, with its principal place of business in Portland, Oregon, located within Multnomah County.  NWEA's mission is to work through advocacy and education to protect and restore water and air quality, wetlands, and wildlife habitat in the Northwest.

12.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY is an agency of the United States Government charged with oversight responsibility under the CWA. EPA's oversight role includes supervision of state efforts to establish and implement water quality standards, and a duty to review and either approve or disapprove such state-promulgated standards.

13.     Defendant GINA MCCARTHY is the Administrator of the EPA, and in that official capacity is required to take certain actions to oversee and implement the CWA, including the review and approval or disapproval of state-submitted water quality standards as well as the promulgation of replacement standards where necessary.  33 U.S.C. § 1313(c).

## LEGAL BACKGROUND

14.     In 1972, Congress adopted amendments to the Clean Water Act in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA requires states to develop water quality standards that establish and protect the desired conditions of each waterway within the state's regulatory jurisdiction. 33 U.S.C. § 1313(a). Water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water, and serve the purposes of" the CWA. 33 U.S.C. § 1313(c)(2)(A).

15.     Water quality standards establish the water quality goals for a waterbody. 40 C.F.R. § 131.2. Water quality standards are implemented, in part, through the issuance of permits to "point sources" of water pollution under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. § 1342. Without such an NPDES permit, any discharge of any pollutant from a point source to waters of the United States is unlawful. 33 U.S.C. §§ 1311(a), 1342(a)(1). All NPDES permits are required to include, among other provisions, effluent limitations or other

conditions that are "necessary to meet water quality standards." 33 U.S.C. §§ 1311(b)(1)(C), 1342.

16.     Water quality standards must include three elements: (1) one or more designated uses of a waterway; (2) numeric and narrative criteria specifying the water quality conditions, such as maximum amounts of toxic pollutants, maximum temperature levels, and the like that are necessary to protect the designated uses; and (3) an antidegradation policy that protects existing uses and ensures and that high quality waters will be maintained. 33 U.S.C. §§ 1313(c)(2), 1313(d)(4)(B); 40 C.F.R. Part 131, Subpart B. For waters with multiple use designations, the criteria must support the most sensitive use. 40 C.F.R. § 131.11(a)(1).

17.     States are required to adopt water quality criteria that protect the designated uses of a water body. 33 U.S.C. § 1313(c). Water quality criteria "must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use." 40 C.F.R. § 131.11(a)(1).

18.     To guide the states, EPA publishes national recommended water quality criteria "accurately reflecting the latest scientific knowledge" on health effects, biological effects, and pollutant characteristics. 33 U.S.C. § 1314(a). States may base their new or revised water quality criteria on this EPA guidance, or they may use other "scientifically defensible methods" of establishing their criteria. 40 C.F.R. § 131.11(b).

19.     EPA's current national recommended human health criteria for arsenic developed under 33 U.S.C. § 1314(a) are 0.018 µg/L for the consumption of water + organisms, and 0.14 µg/L for the consumption of organisms only. *See* EPA, National Recommended Water Quality Criteria, *at* http://water.epa.gov/scitech/swguidance/ standards/criteria/current/index.cfm.  EPA notes that these criteria, published in 1992, are currently being reassessed.  *Id*. at footnote M.

COMPLAINT                                                                                      Page 6 of 18

For example, the National Academy of Sciences has advised that "[c]onsideration should also be given to the growing evidence from human and animal studies that suggests that early-life exposure to arsenic may increase the risk of adverse health effects and the risk of impaired development in infancy and childhood and later in life." National Academy of Sciences, Critical Aspects of EPA's IRIS Assessment of Inorganic Arsenic: Interim Report (2013), at 6, *available at* http://www.nap.edu/catalog/18594/critical-aspects-of-epas-iris-assessment-of-inorganic-arsenic-interim (accessed June 15, 2015).

20.    The CWA requires States to review and, where necessary, revise their water quality standards, including numeric and narrative criteria, at least every three years. 33 U.S.C. § 1313(c)(1). Revised standards must be submitted to EPA for review, and only become effective for CWA purposes if and when EPA approves them. *Id*. § 1313(c)(1), (3); 40 C.F.R. § 131.5.

21.    EPA must review the submitted standards to determine whether the criteria meet the requirements of the CWA. 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.5. Among other requirements, prior to approving a state water quality standard EPA must determine that the State has provided "[m]ethods used and analyses conducted to support [the] water quality standards revisions" and that the State's criteria are "based on sound scientific rationale[.]" 40 C.F.R. §§ 131.6(b), 131.5(a)(5).

22.    Congress enacted the SDWA to ensure that public water supply systems meet minimum national standards for the protection of public health. 42 U.S.C. § 300f *et seq*.

23.    The SDWA requires EPA to promulgate a national primary drinking water regulation, including a maximum contaminant level ("MCL") and maximum contaminant level goal ("MCLG"), for those contaminants that may have an adverse effect on the health of consumers. 42 U.S.C. § 300g-1.

24.    An MCL is "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system." 42 U.S.C. § 300f(3). An MCLG, by contrast, is a non-enforceable health-based goal, representing contaminant levels in drinking water below which there are no known or expected risks to health. 42 U.S.C. § 300g-1(b)(4). MCLs are set as close to MCLGs as feasible using the best available treatment technology and taking treatment costs into consideration. 42 U.S.C. § 300g-1(b)(3)(C).

25.    Arsenic is a regulated contaminant under the SDWA. EPA has promulgated an MCL of 10 μg/L, and a MCLG of zero (0 μg/L), for arsenic. 40 C.F.R. §§ 141.51(b), 141.62(b)(16).

26.    EPA has a longstanding policy of discouraging states from blindly adopting SDWA MCLs as their human health water quality criteria for CWA purposes, especially where routes of human exposure other than drinking water—for example, consumption of fish—must be considered. *See, e.g.*, EPA, Notice of Availability of Water Quality Criteria Documents, 45 Fed. Reg. 79,318, 79,320 (Nov. 28, 1980) (explaining the important differences between MCLs developed under the SDWA and national recommended water quality criteria developed under section 304(a) of the CWA, 33 U.S.C. § 1314(a)).

27.    In a February 28, 1985 guidance memorandum, EPA emphasized that states' deviations from EPA's national recommended water quality criteria were acceptable in appropriate circumstances, "but such deviations must have justifications which are scientifically defensible and adequately documented" and should "reflect the nature of the pollutant[.]" EPA Memorandum from Edwin L. Johnson to Water Division Directors (Feb. 28, 1985), at 1 (emphasis in original), *available at* http://water.epa.gov/ scitech/swguidance/standards/upload/1999_11_03_standards_criteriaselection.pdf.

28.     In a November 3, 1999 guidance memorandum, EPA noted that certain states "have adopted inappropriate human health criteria (e.g., a maximum concentration limit (MCL) when fish ingestion is an important activity)" and that "[f]or the protection of public water supplies, EPA encourages the use of MCLs . . . [but when] fish ingestion is important, then the water quality criteria value developed under Section 304(a) of the Clean Water Act based on fish consumption should be used." EPA Memorandum from Martha G. Prothro to Water Management Division Administrators (Nov. 3, 1999), at 1, *available at* http://water.epa.gov/scitech/swguidance/standards/ upload/1999_11_03_criteria_compliance.pdf.

29.     On November 3, 2000, EPA issued guidance on Revisions to the Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health. 65 Fed. Reg. 66,444 (Nov. 3, 2000). This Methodology provides that where EPA has published a recommended CWA § 304(a) criterion based on its 1980 methodology and "for which EPA has more recently promulgated an MCLG, EPA generally recommends . . . a criterion derived by recalculating the MCLG at an acceptable cancer risk level[.]" *Id*. at 66,450. It further provides that "EPA no longer recommends that an MCL be used where consideration of available treatment technology, costs, or availability of analytical methodologies has resulted in an MCL that is less protective than an MCLG." *Id*. at 66,450–51.

## FACTUAL BACKGROUND

### Arsenic and its Effects on Human Health

30.     Arsenic is a semi-metal element found in both organic and inorganic compounds. Arsenic occurs naturally in soil and in many kinds of rock, especially in minerals or ores that contain copper or lead. Arsenic is commonly released into the environment, including surface

waters and groundwater, through land-disturbing activities such as mining, ore crushing, waste

rock storage and disposal, smelting, and burning coal.

31.     EPA has designated arsenic and its compounds as "toxic pollutants" pursuant to

CWA § 307(a)(1). 40 C.F.R. § 401.15.

32.     In Idaho, releases of arsenic into the environment are often associated with past or

present hard rock mining activities. Several former mines in Idaho are now listed or proposed for

listing on EPA's National Priorities List pursuant to the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA")[2] or are being actively investigated and

remediated by the EPA, in part because of their historic arsenic pollution of surface and

groundwater or the ongoing threat of arsenic discharges to surface and groundwater. Examples

include the Blackbird Mine in Lemhi County; the Eastern Michaud Flats Contamination

Superfund Site near Pocatello, Idaho; the Conjecture Mine in Bonner County, Idaho; the

Lakeview Mine in Bonner County; the Stibnite/Yellow Pine Mining Area in Valley County,

Idaho; and the Talache Tailings Mine Site near Atlanta, Idaho. Additionally, the Atlanta Gold

Mine, which is located near Montezuma Creek in the Boise River watershed, was recently held

liable for violations of the Clean Water Act and ordered to pay a large civil penalty after it

repeatedly violated its NPDES permit limits for arsenic, among other pollutants.

33.     Exposure to arsenic can cause significant adverse effects to human health. *See*

*generally* U.S. Dept. of Health & Human Services, Toxicological Profile for Arsenic (2007)

("Toxicological Profile"), *available at* http://www.atsdr.cdc.gov/toxprofiles/ tp2.pdf. Scientific

studies have identified its adverse effects on virtually every human organ evaluated; for example,

---

[2] The National Priorities List is EPA's list of the most contaminated sites that warrant
priority cleanup under CERCLA. *See generally* EPA, National Priorities List: Basic Information,
*at* http://www.epa.gov/superfund/sites/npl/npl_hrs.htm.

oral exposure in humans can lead to peripheral vascular effects, including gangrene, and can result in increased incidence of high blood pressure, cardiovascular disease, and circulatory problems. Individuals exposed to arsenic in drinking water may also exhibit skin lesions and decreased lung function. Nausea, vomiting, and diarrhea are common symptoms in humans, resulting from irritation of the gastrointestinal tract following repeated oral exposure to low doses. Long-term, low-dose exposure can also lead to peripheral nerve damage, and studies have reported neurobehavioral alterations in children exposed to arsenic. A person's risk for experiencing health effects from arsenic increases the longer that person is exposed.

34.    Arsenic is a known human carcinogen. Skin tumors are the most common type of cancer resulting from oral exposure, but epidemiological studies also indicate increased risk of internal tumors of the bladder, lung, liver, kidney, and prostate. Toxicological Profile at 6; *see also* EPA, "National Primary Drinking Water Regulations; Arsenic and Clarifications to Compliance and New Source Contaminants Monitoring," 66 Fed. Reg. 6,976, 7,001–7,003(Jan. 22, 2001).

35.    People are exposed to arsenic by eating or drinking food or water containing arsenic, inhaling arsenic dust, or direct contact with arsenic. The likely primary route of human exposure to arsenic is through drinking water and consuming food, including fish.

36.    The concentration of arsenic in fish tissue is an important driver of the risks associated with consuming toxic chemicals, including arsenic, present in Idaho's waters. Aquatic organisms bioaccumulate arsenic—meaning the substance builds up and increases concentration in their bodies over time—when they are exposed to arsenic through the water or through their diet.

37.    Fish consumption is a use, for CWA purposes, throughout Idaho's surface waters.

COMPLAINT                                                                 Page 11 of 18

To protect that use, Idaho has adopted numeric water quality criteria for the consumption of
"water and organisms" and "organisms only" for a wide range of toxic pollutants, including
arsenic, that are applicable to nearly every surface water in the State. *See* Idaho Admin. Code §
58.01.02.210.01(a)-(c) and Tables. In fact, Idaho's use of an inadequate fish consumption level
in revising its human health criteria for 88 toxic pollutants was the basis for EPA's disapproval
of those criteria in May 2012. Arsenic was not included in this disapproval, however, because
Idaho's arsenic criteria are not based on human fish consumption.

### The Interests of NWEA's Members

38.    NWEA has members who reside near, visit, use and enjoy rivers, streams, and
other surface waters, including wetlands, throughout the State of Idaho, including the Boise
River, Salmon River, Snake River, and their many tributaries. These NWEA members regularly
use and enjoy these waters and adjacent lands and have definite future plans to continue to use
and enjoy these waters for recreational, subsistence, scientific, aesthetic, spiritual, commercial,
conservation, educational, or other purposes. NWEA's members derive benefits from their use
and enjoyment of Idaho's waters and the fish and aquatic-dependent wildlife that rely upon
Idaho's waters.

39.    EPA's approval of Idaho's water quality standard for arsenic harms NWEA and
its members because the criteria in that standard are not sufficiently protective of human health,
and in particular do not account for potential exposure to arsenic via fish consumption. Some of
NWEA's members enjoy fishing in rivers and streams in Idaho that contain elevated
concentrations of arsenic or are at risk of degradation from arsenic pollution, especially from
mining activities. These members are reasonably concerned about their exposure to arsenic via
consumption of fish; in fact, some of NWEA's members have stopped or reduced eating the fish

they catch in some of Idaho's waters because of their concern over potential exposure to elevated levels of arsenic.

40.    EPA's approval of Idaho's water quality standard for arsenic is likely to result in the discharge of arsenic from NPDES-permitted facilities in concentrations greater than what would otherwise be allowed had EPA *disapproved* the Idaho arsenic standard and required the State to develop human health criteria consistent with EPA's far more stringent national recommended human health criteria. These increased concentrations of arsenic in Idaho's waters will further injure NWEA's members by further exposing them to, or increasing the risk of their exposure to, arsenic through fish consumption, among other routes of exposure.

41.    As a result of EPA's arbitrary and capricious approval of Idaho's arsenic water quality standard for the protection of human health, less protective standards are in use in Idaho than would otherwise be applicable, which adversely affects human health and aquatic and aquatic-dependent species. NWEA's members would derive more benefit and enjoyment from their use of Idaho's waters, including through fish consumption, and adjacent lands if they knew that Idaho's arsenic standard was fully protective of human health, fish, and wildlife.

42.    NWEA and its members have a specific interest in the full and proper implementation of the CWA, which was designed to protect our nation's waters and the designated uses that depend upon the quality of those waters. EPA's approval of Idaho's water quality standard for arsenic harms NWEA and its members' interests by decreasing the CWA's protections for water bodies and the people who use them.

43.    The above-described interests of NWEA and its members have been, are being, and, unless the relief requested herein is granted, will continue to be adversely affected by EPA's approval of Idaho's arsenic standard. The relief requested in this complaint will ensure that the

arsenic water quality criteria used and implemented in Idaho are scientifically defensible and sufficiently protective of human health.

**Idaho's Water Quality Standard for Arsenic**

44.     On December 22, 1992, EPA promulgated the National Toxics Rule ("NTR"), which established numeric toxic criteria for Idaho. 33 U.S.C. § 1313(c)(2)(B); 40 C.F.R. § 131.36(b)(1). The NTR arsenic criteria for the protection of human health are 0.14 μg/L for consumption of fish only and 0.018 μg/L for consumption of both fish and water. The NTR criteria are identical to EPA's current CWA section 304(a) recommended criteria for arsenic, published in 1992, which are based on a one in a million risk of cancer and a fish consumption rate of 6.5 grams/day.

45.     On August 24, 1994, Idaho adopted its own water quality standards by incorporating the NTR into Idaho's rules by reference. On June 25, 1996, EPA approved Idaho's standards for toxics and subsequently withdrew Idaho from the NTR, effective November 10, 1997. 62 Fed. Reg. 52,926 (Oct. 9, 1997).

46.     Idaho subsequently weakened its CWA arsenic human health criteria by raising them more than a hundredfold to 50 μg/L, which was at the time the arsenic MCL for drinking water under the SDWA. On April 23, 1999, Idaho submitted its revised arsenic criteria to EPA for approval; EPA never acted on that submission, which under EPA regulations applicable at the time made it effective for CWA purposes. *See* 40 C.F.R. § 131.21(c)(1) (1999); 65 Fed. Reg. 24,641, 24,642 (April 27, 2000).

47.     On January 22, 2001, EPA finalized a rule that lowered the arsenic MCL from 50 μg/L to 10 μg/L under the SDWA.

COMPLAINT                                                                Page 14 of 18

48.     In 2010, Idaho again revised its CWA arsenic human health criteria by adopting EPA's 10 µg/L MCL under the SDWA as the criteria for both consumption of water and fish and consumption of fish only. Idaho Admin. Code § 58.01.02.210(b). Idaho submitted its revised arsenic criteria to EPA for approval on June 21, 2010.

49.     Idaho's 2010 revision to its arsenic human health criteria was not the result of a meaningful and CWA-compliant scientific process, but rather was a negotiated outcome to resolve pending litigation. As Idaho explained at the time:

> EPA's current recommended Clean Water Act 304(a) arsenic criteria for the protection of human health from exposure to arsenic due to drinking water and/or eating fish from surface water are much lower than the arsenic MCL of 10 µg/L. Nonetheless, EPA has approved the use of 10 µg/L as CWA criteria in many states around the country . . . It was agreed that if Idaho adopted and EPA approved an arsenic human health criterion of 10 ug/L for surface waters in Idaho . . . then [the plaintiff] would settle its complaint.

Idaho Department of Environmental Quality Memorandum, Justification: Idaho Rulemaking Docket 58-0102-0801, Arsenic Human Health Criteria & Low Limit on Hardness Used in Cadmium Aquatic Life Criteria Calculation (June 21, 2010), at 1.

50.     By letter dated July 7, 2010, EPA formally approved Idaho's June 21, 2010 revisions to its arsenic human health criteria pursuant to EPA's authorities and obligations under 33 U.S.C. § 1313(c)(2) and 40 C.F.R. § 131.5.

## CLAIM FOR RELIEF

51.     Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs.

52.     The CWA requires that water quality criteria be set at a level necessary to protect the designated uses of a waterbody and to enhance water quality. 33 U.S.C. § 1313(c)(2), (d)(4)(B); 40 C.F.R. Part 131, Subpart B.

COMPLAINT                                                                                            Page 15 of 18

53.     EPA regulations state that water quality criteria "must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use," and must also be set at the level necessary to protect the most sensitive use. 40 C.F.R. § 131.11(a)(1).

54.     Before EPA may approve a state-promulgated water quality standard, it must determine that the state has provided "[m]ethods used and analyses conducted to support [the] water quality standards revisions" and that the state's criteria are "based on sound scientific rationale[.]" 40 C.F.R. §§ 131.6(b), 131.5(a)(5).

55.     The APA provides those who are "adversely affected or aggrieved" by an agency action a right to judicial review of that action. 5 U.S.C. § 702 *et seq*.

56.     EPA's July 7, 2010 approval of Idaho's revised human health water quality criteria for arsenic is a final agency action for which there is no other adequate remedy in a court, and is therefore subject to judicial review under the APA, 5 U.S.C. § 704.

57.     The APA provides that an agency's action shall be held unlawful and set aside by a reviewing court if the agency's findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

58.     EPA's July 7, 2010 approval of Idaho's revised human health water quality criteria for arsenic was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2)(A), for at least the following reasons:

(A)     EPA's approval was contrary to the CWA and its implementing regulation at 40 C.F.R. § 131.5(a)(2) because EPA failed to determine whether—or incorrectly

determined that—Idaho's revised arsenic criteria protect the designated uses of Idaho's waters;

(B)    EPA's approval was contrary to the CWA and its implementing regulation at 40 C.F.R. § 131.5(a)(5) because EPA failed to determine whether—or incorrectly determined that—Idaho's revised arsenic standard contained the minimum elements required by 40 C.F.R. § 131.6;

(C)    EPA's approval was contrary to the CWA and its implementing regulation at 40 C.F.R. § 131.11 because Idaho's revised arsenic criteria were neither "based on sound scientific rationale" nor based on EPA's national recommended arsenic criteria or "[o]ther scientifically defensible methods;"

(D)    EPA's approval was arbitrary and capricious because it was counter to EPA's longstanding policy against using SDWA MCLs as the human health criteria where fish consumption is a use, or where the MCL is less protective than the MCLG.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff NWEA respectfully requests that this Court:

1.  Declare that EPA's July 7, 2010 approval of Idaho's human health criteria for arsenic was arbitrary, capricious, and contrary to law within the meaning of the APA, 5 U.S.C. § 706(2)(A);

2.  Hold unlawful and set aside EPA's approval of Idaho's arsenic water quality criteria;

3.  Award Plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

4.  Grant such other and further relief as this Court deems just and proper.

COMPLAINT

DATED this 25th day of June, 2015.

Respectfully Submitted,

s/ *Lia Comerford*
Lia Comerford
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR  97219
T: (503) 768-6823
F: (503) 768-6642
comerfordl@lclark.edu

*Attorney for Plaintiff*